## Julius Levin Company, Inc., Appellee, v. Morris S. Rosenfield et al., trading as Rosenfield Bros., & Company, Appellants.

## Gen. No. 27,641.

1. PLEADING—*necessity for pleading foreign statutes.* In an action of trover for the conversion of whisky, an objection that the Illinois Uniform Sales Act, Cahill's Ill. St. ch. 121a, ¶ 4 *et seq.,* is not applicable because the contract of sale and the promissory note out of which the controversy arose were executed in California, in which State such act has not been adopted, must be raised by specially pleading the laws of such State to be available on appeal.

2. SALES—*applicability of Uniform Sales Act where property pledged for payment of purchase price.* The mere fact that, as a part of a whole transaction of sale, the goods bought were pledged by the buyer with the seller as security for the payment of the purchase price does not bring the transaction within the limitation of the Uniform Sales Act, Cahill's Ill. St. ch. 121a, ¶ 78, that unless so stated the act shall not apply to "any transaction in the form of a contract to sell or a sale which is intended to operate by way of a mortgage, pledge, charge, or other security."

3. SALES—*when rescission of sale by implication shown.* A buyer of whisky is shown to have rescinded the contract of purchase where the evidence shows that the purchase was made in 1916 and that the buyer pledged the whisky and the warehouse receipts for it with the seller on January 15, 1917, and on that date gave its note for the purchase price payable January 1, 1918, that thereafter it sought to have the contract canceled and that although the seller claimed to have acceded to such request and the buyer denied that it had ever received notice of such cancellation, with knowledge of such claim by the seller, the buyer received back its note for the purchase price, paid the amount of an alleged unpaid balance due from it, as shown by the bill rendered by the seller, without objection or denial and made no further claim for almost a year thereafter that the contract of sale was still in force, and retained the note.

4. SALES—*what constitutes unreasonable delay as matter of law for tender of purchase price of fluctuating commodity.* A delay of almost a year in tendering the agreed purchase price of a greatly fluctuating commodity after the price was due under the contract of sale, is unreasonable as a matter of law under the provisions of the Uniform Sales Act, Cahill's Ill. St. ch. 121a, ¶ 64, that an

unpaid seller with a right of lien may rescind the transfer of title and resume the property in the goods where he expressly reserved the right to do so in case of default by the buyer or where the buyer has been in default in payment of the purchase price "an unreasonable time."

Appeal by defendants from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in the first division of this court for the first district at the March term, 1922. Reversed. Opinion filed June 25, 1923. Rehearing denied July 6, 1923. *Certiorari* denied by Supreme Court (making opinion final).

MERGENTHEIM, ALTHEIMER & MAYER, for appellants; MORTON A. MERGENTHEIM, of counsel.

EASTMAN, WHITE & HAWXHURST, for appellee; HOMER C. DAWSON, of counsel.

MR. JUSTICE MATCHETT delivered the opinion of the court.

This cause is now before us on rehearing granted. Upon our original consideration it was decided that the judgment entered by the trial court upon the verdict of a jury should be reversed and the cause remanded, and an opinion stating our reasons therefor was filed.

Counsel for the respective parties have made no objection to the facts as stated in the former opinion, but differ much as to the rules of law which should be applied. The undisputed facts to which we are called upon to apply the law are these:

The plaintiff filed a declaration in three counts. The first count charges that on December 5, 1918, in Montgomery county in the State of Kentucky, the plaintiff was lawfully possessed of 300 barrels of Mount Sterling Associated Bourbon whisky in bond Spring 1913's and 15 barrels of Mount Sterling Associated Bourbon whisky in bond Spring 1911's; that on that day the plaintiff lost the goods and chattels out

of its possession; that the same afterward came into possession of defendants by a finding, and that defendants converted and disposed of the same to their own use.

The second count charges that on the same day plaintiff was possessed of warehouse receipts for this whisky; that these receipts were attached to a note or acceptance signed by plaintiff, dated January 15, 1917, and due January 1, 1918, for the sum of $16,152.30, payable to the order of defendants; that these receipts were casually lost and converted by defendants.

The third count is in case for the same alleged wrongs, but there was no attempt on the trial to make proof of facts as alleged in this count.

The defendants filed a plea of the general issue.

Plaintiff is a dealer in whiskies, etc., at San Francisco, California. The defendants are a copartnership doing business under the names of the Sunny Brook Distillery Company and Associated Distilleries of Kentucky; they were manufacturers, bottlers and distributors of whisky, and owners of warehouses in which the same was stored. One of the brands of whisky in which they dealt was known as "Associated" whisky, and they also dealt in a higher grade known as "Sunny Brook" whisky. They had offices in Chicago, New York and Louisville. November 25, 1916, plaintiff and defendants made the following memorandum:

"Bought of ROSENFIELD BROS. & COMPANY, distillers, 900 barrels Mt. Sterling Associated Bourbon Whiskies in bond Spring 1913s at 55c per proof gallon.

"Terms: one acceptance covering the purchase of the above 900 barrels due January first, 1918, with 5% interest added. As withdrawals are made against the above mentioned 900 barrels, sight drafts to be made covering the amount of said withdrawals, and payment for same to be applied on the original acceptance mentioned above. It is understood and agreed that the full purchase price on the above 900 barrels to

be paid for with 5% interest added by January first, 1918; all charges on the above purchase to be allowed to February first, 1917, and interest on said purchase to begin February first, 1917; invoice to be dated as of January 15, 1917.

"Bottling charges on the above to be identical with the bottling charges established on the previous sale, namely, 40 cents for Fours and Fives, 50 cents for pints and 65 cents for half pints."

An extra 15 barrels were given with this order. Plaintiff alleges that the consideration for these 15 barrels was certain advertising of Sunny Brook whisky, but the defendants allege that the same were given as a bonus.

On December 9, after the execution of this memorandum, the plaintiff by telegram requested as a personal favor the release of 300 barrels of this whisky, and on December 13 the defendants by wire acceded to its request. Thereafter the plaintiff executed and delivered to the defendants its note for the price of 600 barrels. This note, or "acceptance," as it is called by the parties, was as follows:

"$16,152.30        San Francisco, Cal., Jan. 15, 1917.

"On January 1st, 1918, after date we promise to pay to the order of Rosenfield Bros. & Co. Sixteen thousand one hundred fifty-two and 30/100 Dollars. Value received negotiable and payable at San Francisco, with interest at the rate of 5% per annum from February 1, 1917."

This note or acceptance, the evidence shows, was drawn by the defendants at their Chicago office and forwarded by mail from Chicago to the bank at San Francisco, where the same was signed by plaintiff. The defendants also forwarded to the bank and attached to the note warehouse receipts representing the whisky described in the memorandum. These warehouse receipts were uniform and filled out on the printed forms then in use by the defendants. The plaintiff gave defendants notice to produce these receipts upon the trial but they stated, through their

counsel, that they did not have possession of the same, whereupon a copy was introduced in evidence and appears in the record. It is issued in the name of the Associated Distilleries of Kentucky, Inc., and recites that said corporation has received for account and subject to the order of defendants, certain barrels of whisky, deliverable to them or their order, subject to the terms of such indorsements as they may make thereon, and on return of the receipt, and upon the order of the holder thereof, and the payment of the United States taxes, and other taxes due thereon, and storage at the rate of five cents per barrel per month from entry into bond, payable as demanded from the original holder thereof, and subject to the further conditions expressed; that loss or damage by fire, accidents, evaporation, etc., should be at the owner's risk subject to the rules and regulations adopted by the Kentucky Distillers Association dated January 4, 1905. The receipt further provides that unless it is presented and all payments due made on or before the expiration of the bonded period, it will become void and all rights of the holder thereof cease. On the reverse side is the indorsement of defendants transferring the receipt to plaintiff, or its order, "subject to the conditions named therein, and with the further provision that the whisky described is delivered only on the return of this warehouse receipt and the written order of the holder thereof, and on payment of the United States Government tax and all other taxes, and storage for our account, at the rate of five cents per barrel per month from Feb. 1, 1917." These receipts were returned by the bank to defendants, but were not reindorsed by plaintiff.

The defendants purchased insurance on the whisky represented by these receipts for one year from January 12, 1917, and mailed to the plaintiff bill for the premiums on the same. The insurance policies were attached by the defendants to the warehouse receipts and remained in their possession. While the plaintiff

was named the beneficiary in each of these policies, a rider was also attached to each of them which provided that the loss should be paid to the defendants as their interest might appear. These insurance policies expired by limitation on January 12, 1918. The same were not renewed by the plaintiff nor was any application made by plaintiff for the renewal of the same.

On March 30, 1917, plaintiff wrote defendants asking if defendants would assist plaintiff "by crediting our account with the goods that you are carrying for us." On April 4, defendants replied that they would consult their Chicago partners and would do everything in reason, and again on April 9 wrote agreeing to cancel 350 barrels of Sunny Brook whisky which plaintiff had ordered, leaving the rest stand. On April 19, plaintiff expressed its appreciation of this cancellation, and stated:

"I am not making this request with the idea of being relieved of the whisky on account of the decrease in the market, but I wish that you would take this matter up again with your partners and see if they won't relieve us of the Associated, if not of all of at least half."

The defendants assert that on May 2, 1917, they replied to this acceding to plaintiff's request. The plaintiff denies that it received any such letter, and this was one of the issues of fact submitted to the jury.

The price of whisky having in the meantime somewhat advanced, plaintiff on June 7, 1917, wired defendants:

"Not having received reply to our letters regarding cancelling portion of our holdings of Associated beg to advise that we have decided now to retain same. * * *"

On June 9, defendants telegraphed plaintiff:

"We cancelled three hundred barrels of your Associated holdings some time ago as per your request would have cancelled all but thought that you would

some time come back later for some more. Lucky that we did this as we have no more Associated to offer.''

A bitter correspondence followed by letter and by wire. On June 22, plaintiff asked defendants to refer the matter to their Mr. Levy, with whom plaintiff usually dealt. The next day Mr. Levy wrote from New York intimating that plaintiff's desire to keep its contracts increased and decreased with the rise and fall of the market price of whisky, and said, ''You can't play me 'Heads I win,' and 'Tails you lose.' '' On June 27, plaintiff wrote Mr. Levy, ''You know and we know that there was no cancellation.''

July 11, defendants wrote plaintiff inclosing an alleged copy of their letter of May 2, and July 17, plaintiff replied that no such letter had been received and that it believed no such letter was ever sent. This communication remaining unanswered, plaintiff again wrote defendants August 20 expressing surprise. A few days later defendants answered, ''I don't see why your letter of July 17 required any answer.'' Thereupon the correspondence between the parties on this particular subject ceased for the time.

August 30, defendants wrote plaintiff from Chicago informing it that they had received a letter from their distillery inclosing a copy of a writ of attachment, ''attaching whatever property of yours we have in our possession.'' The letter further stated that in looking over the account defendants found that they were not holding any merchandise in Louisville for the plaintiff that was paid for, and, therefore, would have to answer that they had nothing in their possession belonging to plaintiff. September 5, plaintiff acknowledged receipt of this letter, stating, ''We certainly thank you for calling our attention to it.''

September 11, defendants sent to plaintiff a statement of ''note'' account. The statement under date of January 24 charged plaintiff with $16,152.30 for notes, and showed a credit under date of May 31 of cash in the amount of $8,076.15, an amount equal to

one-half of this acceptance note. Other items appeared therein and the statement showed a balance due to the defendants of $3,451.07.

October 3, 1917, plaintiff wired defendants:

"Forward for collection through Anglo and London Paris National Bank San Francisco all certificates you have on hand covering Associated Whiskey for our account."

October 10, plaintiff again wired:

"Your letter October Third received Have wired Thirty four hundred fifty three naught seven If there is any additional interest accrued advise us and we will forward you remittance."

October 11, defendants wrote plaintiff:

"We are in receipt of your telegram of even date, informing us that you have wired us $3453.07. The warehouse receipts were turned over to the Bank this morning, but we neglected to deliver to them two insurance policies—Western No. 207873 and The Phoenix No. 23060, which we are carrying on these goods, which you will find enclosed herewith. Any adjustment you wish to make on the insurance on the whiskies stored in our warehouse, kindly take up direct with Messrs. Ferguson, Scott & Harris of Louisville.

"We also enclose herewith your cancelled note of $16,152.30.

"We inclose herewith invoice for $3.25, being the interest on $3340.95 from October 3rd to October 10th, for which we will ask you to kindly send us your check."

The balance due to defendants as shown by this account was paid by plaintiff in due course and without objection.

October 24, Louis H. Brownstone, a director of the plaintiff company and its attorney at San Francisco, telegraphed defendants at Chicago, stating that he had examined all the correspondence with reference to the Associated whisky and was convinced that there was no cancellation. He stated:

"They are entitled to receive from you these three hundred and fifteen barrels and unless arrangements are made to deliver this whiskey immediately will begin legal action to recover the same. Wire answer."

Defendants replied:

"It is up to you to bring action whenever your Clients see fit to do so."

December 6, plaintiff wrote defendants:

"Enclosed find our check for $3.25 in payment of interest as per your statement of December first."

December 13 thereafter defendants replied expressing thanks for this remittance.

It affirmatively appears that the canceled note was never returned, and it was in fact produced by the plaintiff upon the trial of this cause. It also affirmatively appears that it was never paid and that there was never any offer to pay it, either prior to or on the date of its maturity, which was January 1, 1918.

Eleven months thereafter, on December 5, 1918, the plaintiff, through its attorneys at Chicago, made a written demand upon defendants to turn over the warehouse receipts for the whisky, and at that time made a tender to the defendants of $8,822, presumed by them to be the amount then due upon the note, stating that if the difference was any greater they stood ready to pay it. This request and demand defendants refused to comply with and this suit was the result. The evidence shows a fluctuating market price of this whisky of from 50 cents to $2.75 a gallon.

Defendants, at the close of plaintiff's evidence and again at the close of all the evidence, made a motion for a directed verdict in their behalf, which was denied, and they argue in this court that it was error for the trial court to deny this motion. In support of this assignment they say, in substance, that when the note fell due January 1, 1918, plaintiff lost its right to demand possession of the certificates or the whisky; that in order to maintain trover the plaintiff must show a general or special property in the thing converted,

and a right to immediate and unconditional possession, not dependent upon any act to be done by plaintiff.

Defendants further contend that the formal demand and refusal did not necessarily fix the date of conversion; that a refusal of delivery, after request, was sufficient evidence of a taking; and if a conversion in fact occurred, it must have been in 1917 and not in 1918, as the jury found.

It is further argued by defendants that there was an account stated between the parties, and that long-continued acquiescence by plaintiff in defendants' possession of the property, with the knowledge that defendants claimed it of right, barred plaintiff's right to damages, which would not have been suffered but for such acquiescence; that through delay of its formal demand for the property until December 5, 1918, plaintiff waived its rights, if it had any; and, further, that whether there was a waiver such as would preclude the maintenance of this suit was a question of law for the court and not of fact for the jury, and that the court should, therefore, have given the peremptory instruction as asked.

Defendants further argue that the verdict is contrary to the weight of the evidence. They also urge that the court erred in instructing the jury.

The foregoing facts are not disputed, and the verdict of the jury has conclusively determined further material issues of fact which were controverted upon the trial. These are, first, that the extra 15 barrels of whisky were to be given in consideration of advertising; and, secondly, that the supposed letter of May 2, acceding to plaintiff's prior request for a cancellation of its order, was never mailed to or received by the plaintiff; thirdly, that there was no stated account between the parties.

The parties agree that in order to maintain a suit in

trover a plaintiff must show a general or special property in the thing converted and a right to immediate and unconditional possession, but the position of the plaintiff is that under this evidence the defendants were simply pledgees of the warehouse receipts and property in controversy; that the receipts were in possession of the defendants merely as collateral, and that defendants could not sell or dispose of the same until the maturity of the note, and then only upon demand for payment and reasonable notice of time and place of sale. This is the general rule where property is pledged as collateral to an indebtedness represented by negotiable paper. *Wadsworth v. Thompson,* 8 Ill. (3 Gilm.) 423; *Union Trust Co. v. Rigdon,* 93 Ill. 458; *National Bank of Illinois v. Baker,* 128 Ill. 533. The court in the instructions given at the request of plaintiff adopted the views of plaintiff in this respect and instructed the jury that these rules of law were applicable to the facts of the case. Indeed, we think some of these instructions amounted to a direction to find for the plaintiff.

We stated in our former opinion that the Uniform Sales Act of Illinois (Cahill's Ill. St. ch. 121a) "became a part of the transaction and the parties are bound the same as if its provisions had been written into the contract of sale." The plaintiff in its petition for rehearing argues that this statute should not be held applicable because the contract of sale and the note or acceptance were executed in California, and, it says, the Uniform Sales Act of Illinois has not been adopted in that State. This is a surprising contention on this record. The question is not raised by any of the pleadings. In the briefs of the parties and upon oral argument the case was considered as one to which the statute and the common law of this State were applicable. We cannot take judicial notice of the laws of California. As is said in Minor on Conflict of Laws, sec. 212:

"The laws of other States are universally regarded as facts which, independently of statutes, must be specially pleaded, wherever the *lex fori* requires other facts, under like circumstances, to be pleaded."

See *Leathe v. Thomas,* 218 Ill. 246; *Opp v. Pryor,* 294 Ill. 538; and *Thoms v. Thoms,* 222 Ill. App. 618.

Plaintiff further says, however, that the Uniform Sales Act of this State is not applicable by reason of section 75 of that Act (Cahill's Ill. St. ch. 121a, ¶ 78), which provides that, "unless so stated," the act shall not apply "to any transaction in the form of a contract to sell or a sale which is intended to operate by way of a mortgage, pledge, charge, or other security." We are not cited to any cases construing this section. It seems to have been adopted into the Illinois act from paragraph 4 of section 61 of the English Sales Act. A pledge is, of course, distinguishable from a sale in that it is merely a deposit of property as security for the performance of some act, usually the payment of a debt, while a sale is the present transfer of property itself for a consideration. The transaction here considered was not in the first instance the pledge of property for the payment of a debt, but on the contrary was a contract of sale. The fact that as a part of the whole transaction the property was to be pledged for the payment of the purchase price would not bring the transaction within the limitation of section 75. At any rate, the phrase "unless so stated" makes it necessary to consider this question with reference to the language used in each paragraph supposed to be applicable.

We assume now, as we assumed in the former opinion, that the controverted questions of fact have been settled in favor of the plaintiff by the verdict of the jury, but so assuming we still think it necessary to determine as a question of law whether on December 5, 1918, plaintiff had such property rights in the receipts

in question as to enable it upon tender of the amount due and demand to maintain its action of trover. This point is raised on the record by the motion of defendants for an instructed verdict and the conclusions which we have reached on this point will make it unnecessary to consider other alleged errors. We further assume, in considering this question, that the effect of the original transaction was to place the title to the warehouse receipts in the plaintiff, subject to a lien in favor of defendants and their right of possession under that lien. It would logically follow that as long as the original contract was in force and effect, plaintiff would have the right to tender payment of the amount due and receive the goods upon its demand. The contract was necessarily in force unless and until it was abandoned, canceled or rescinded. Such cancellation or rescission would necessarily be brought about in one of two ways: First, by operation of law, or second, by an agreement of the parties, either express or implied. There was no express agreement of the parties, but defendants say that the plaintiff by accepting the canceled note, the insurance policies and the various statements of account requested by it, without protest or denial of any kind, and by its payment in full of the bill rendered it by defendants, including the last bill for interest in December, 1917, and by its failure to make any further assertion of its claim for a year thereafter, must be conclusively presumed to have waived all its legal rights under the original terms of the transaction.

We are inclined to agree with this contention. Just as contracts may be implied from the conduct of the parties, so may a rescission of contracts be implied therefrom. Words amount to very little where actions are conclusive. The consideration given by the plaintiff for the goods in question was its note or acceptance. This note was returned to the plaintiff can-

celed on October 11, 1917, and while plaintiff thereafter, on October 24, telegraphed the defendants insisting that the contract was still in force, it made no offer to return the note, and did not in fact return it. It spoke as if the contract was to continue in existence but it acted as it would act upon an acceptance of its cancellation. Again, the note by its terms fell due January 1, 1918. If the contract was still in force and effect the duty devolved upon plaintiff to pay the note according to its tenor. It did not pay it and it did not offer to do so. We think the inference of a cancellation or rescission which arises from this conduct is just as strong as would be the inference of a promise to pay by one who, upon the receipt of goods, accepted and used them.

Certain it is that, at least upon a lapse of a reasonable time after the maturity of the note, there must have been a payment or an offer to pay it, failing which a conclusive inference of rescission and cancellation of the contract would arise. This inference would arise, we think, irrespective of any provision of the Uniform Sales Act. Assuming, however, that act to be applicable, we find that section 61 (Cahill's Ill. St. ch. 121a, ¶ 64) thereof provides:

"An unpaid seller, having a right of lien * * * may rescind the transfer of title and resume the property in the goods, where he expressly reserved the right to do so in case the buyer should make default, or where the buyer has been in default in the payment of the price an unreasonable time."

Assuming, therefore, that the contract was still in force on January 1, 1918, and that the defendants upon that day upon demand would have been obligated to deliver to plaintiff 315 barrels of the kind of whisky described, or the warehouse receipts representing the same, it would follow that the law placed upon plaintiff on that day the correlative and corresponding

duty of paying its obligation. It did not do so. It did not offer to do so. It spoke no words by which the defendants would understand that it was still insisting that it had a valid contract of sale. The situation was, we think, such as cast upon it that duty. It had notice that the defendants claimed a cancellation of the contract, a claim which had been repeatedly made and repeatedly denied. There could not be any possible misunderstanding of the situation in that respect.

The plaintiff contends that it could not be estopped by mere silence and that the only obligation cast upon it was to make its tender and demand within a reasonable time, and that this might be any time within the statute of limitations. In support of this contention it cites *Emerson v. North American Transportation & Trading Co.,* 303 Ill. 282; *In re Fallon v. Fallon,* 110 Minn. 213, 124 N. W. 994; *In re Gardner's Estate,* 228 Pa. 282, 77 Atl. 509. These cases involve questions arising on actions brought upon certificates of deposit and are, we think, clearly inapplicable to the facts of this case. If we regard section 61 of the Uniform Sales Act (Cahill's Ill. St. ch. 121a, ¶ 64) as applicable, then, upon a most favorable construction thereof in plaintiff's favor, the tender of payment and demand must have been made within a time not unreasonable. In our former opinion we stated that the contention of defendants that it should have been held as a matter of law that the delay until December 5, 1918, was unreasonable, carried much weight, but that we were disposed to hold that the question of whether under all the circumstances the delay was unreasonable should have been submitted to the jury under proper instructions. We have now come to the conclusion that the court should have held as a matter of law that the delay was unreasonable. In arriving at this conclusion we have been influenced by the fact

that the market price of the goods here involved fluctuated very much from time to time. Further, we have found the case of *Foss-Schneider Brewing Co. v. Bullock*, 59 Fed. 83, cited by defendants in their reply to the petition for rehearing, most persuasive. The court there held, in an opinion delivered by Taft, then circuit judge, that delay by a vendee of thirty days in the rejection of a commodity received by mistake but fluctuating in its market price, "was altogether unreasonable."

Our conclusions are that the instruction for the defendants at the conclusion of all the evidence should have been given, and that, on the uncontradicted evidence, plaintiff cannot recover. The judgment is therefore reversed without remanding.

*Reversed.*

McSURELY, P. J., and JOHNSTON, J., concur.